## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-239 (RBW)** |
| **v.** | : | |
| | : | |
| **PAUL KOVACIK,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Paul Kovacik to 90 days of incarceration, and $500 of restitution in this case.

### I.      Introduction

Paul Kovacik, 55 years-old and unemployed, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Kovacik pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a term of incarceration of

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

90 days is appropriate in this case because Kovacik: (1) traveled extensively throughout the U.S. Capitol for approximately 30 minutes, contributing to the chaos, disorder, and delaying police from reestablishing security and order; (2) filmed extensively inside the U.S. Capitol, including rioters kicking down a door and dropping government property off of a balcony; (3) later uploaded his footage onto his YouTube channel with titles such as "Treason Against the United States is about to be committed" and "Ashli Babbitt's blood on floor"; and (4) has an extensive criminal history, with 24 prior criminal convictions.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Consequently, the facts and circumstances of Kovacik's conduct support a sentence of 90 days of incarceration.

## II.   Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 27 (Statement of Offense), at 1-7.

*Defendant Kovacik's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, after attending the "Stop the Steal" rally, Kovacik approached the U.S. Capitol from the West Lawn, climbing the stairs to the Upper West Terrace, and entering through the doors of the Senate Wing entrance to the Capitol at approximately 2:26 p.m.



*Image 1: Kovacik's entry into the U.S. Capitol via Senate Wing Doors*

Kovacik traveled extensively throughout the building for the next 30 minutes while filming events on his cellphone. After entering through the Senate Wing doors, he moved with the flow of rioters, proceeding south toward the Crypt. At approximately 2:29 p.m., he boarded an elevator on the first floor in the Crypt with other individuals, including Zachary Alam, 21-CR-190 (DLF).



*Images 2-3: Kovacik entering an elevator in the Crypt (first floor) on the left; Kovacik and others exiting the elevator on the fourth floor on the right*

After exiting the elevator on the fourth floor, Kovacik proceeded to the H405 stairwell, and walked down one flight to the third floor. On the third floor, Kovacik and Alam headed north toward the Gallery Stairs. Standing in close proximity to Alam as the two stood over a railing

looking down into the east front Rotunda interior, Kovacik looked on and filmed as Alam threw an object off a balcony and in the direction of police below. *See* Exhibit A at 27:00.



*Image 4: A screenshot of Kovacik's footage of Alam throwing an object off of a balcony*

Kovacik then headed south, walking through clearly private office corridors, randomly trying to open locked office doors as he traveled toward the House side of the Capitol. He then proceeded east to west through the House Gallery; at the west stairs near H219 he walked down one flight to the second floor.



*Image 5: Kovacik walking through the House Gallery*

On the second floor, Kovacik proceeded east, until being corralled by a plainclothes security officer into the Statuary Hall connector where a large crowd of rioters had massed. The crowd soon pushed past the officers, spilling out into the House corridor. Kovacik moved with the surge, continuing east, entering the Sam Rayburn room for approximately one minute.



*Image 6: Kovacik entering the Sam Rayburn room*

Kovacik exited the Rayburn room and continued east to the Upper House doors. He remained in the corridor on the east side of the House chamber for approximately 12-15 minutes. During that time, Kovacik was part of a large mass of rioters that filled the area, screaming, chanting, and attempting to break down doors. In one of Kovacik's videos "Can you find Ashli Babbit in the video, and notice what she is doing?," Kovacik stood by and filmed as rioters repeatedly tried to kick down a door. *See* Exhibit B at 4:30.



*Image 7: Screenshot of Kovacik's video of rioter kicking down door*

In the same video, the mass of rioters can be seen flooding the corridor, blocking officers attempting to respond to the shooting of Ashli Babbitt. *Id*.

6



*Image 8: Screenshot of Kovacik's video of rioters massed in House corridor*

And in the same video, Kovacik recorded the area where Ashli Babbitt was shot, capturing the aftermath, very shortly after the shooting. *See* Exhibit B starting at 7:30.



*Image 9: Screenshot of Kovacik's video of Ashli Babbitt shooting aftermath*



*Image 10: Kovacik exiting the U.S. Capitol on the House Wing side*

At many points during the approximately 25 minutes that Kovacik was inside of the Capitol building, he stood in close proximity to other rioters, filming them as they attempted to break down doors and destroy property. Kovacik exited the East House front door at 2:54 p.m.

*Social Media Posts*

After the attack on the Capitol, Kovacik posted sixteen videos he had recorded on January 6, 2021 using his cellular phone to his "Wisconsin's Game" YouTube account. On November 16, 2021, at the request of the FBI, Kovacik provided links to the recorded YouTube videos via email.

*Kovacik's Pre-arrest Interview with the FBI*

On November 16, 2021, Kovacik gave a voluntary pre-arrest interview to the FBI. During the interview, he stated that he took the train to Washington, D.C., and stayed overnight on January 6, 2021. Kovacik's stated purpose for the trip to Washington D.C. was to witness the ratification of the Presidential electoral votes. He traveled alone and did not know anyone personally at the event. At approximately 1:30 pm, on January 6, 2021, Kovacik was leaving Washington D.C. Union Train Station when he saw communications on Twitter that there was some commotion on

the front lawn of the Capitol and that there were people entering the Capitol. According to Kovacik, these reports reminded him of the 1980's invasion of Romania, and believing this would be a historic event, he made his way over to the West Front of the Capitol. He reported seeing several hundred people gathering around the Capitol. Kovacik told FBI he was upset that the election was stolen and wanted to record history, and repeatedly emphasized that he was not there to destroy property or hurt anyone.

Kovacik reported seeing fences as he approached the West front doors of the Capitol, but claimed the fences were not put together. Kovacik reported hearing alarms sounding and observing police officers near the entrances of the Capitol, but according to him, the officers were not actively denying anyone entry to the building.

According to Kovacik, the front doors to the Capitol were open, officers were encouraging people to enter, and the people that were entering the building were being respectful. This account of his entry into the U.S. Capitol is at odds with the video recording he made during his entry, when he entered by doors with broken glass as part of a large mob that was clearly not welcomed by police.

Kovacik recalled being with another individual whom he observed throw "some type of sticks" down a level towards police.[2] Kovacik identified that individual as Zachary Alam. Kovacik then made his way down to the second floor; he described a commotion and learned that a girl had been shot.

*The Charges and Plea Agreement*

On May 10, 2022, the United States charged Kovacik by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 21, 2022,

---

[2] After reviewing the YouTube videos provided by Kovacik, it is believed believe that the object he described is a velvet hanging stanchion rope. *See* Exhibit A at 27:00 (https://www.youtube.com/watch?v=xLKGBtHipck).

Kovacik was arrested in the Southern District of Indiana. On July 12, 2022, the United States charged Kovacik by a 4-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 13, 2023, pursuant to a plea agreement, Kovacik pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Kovacik now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kovacik's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kovacik, the absence of violent or destructive acts is not a mitigating factor. Had Kovacik engaged in such conduct, he would have faced additional criminal charges.

The most important factors in Kovacik's case are the extended period that he spent in the U.S. Capitol, filming and standing in close proximity to other rioters who were destroying property, and his remarkably long criminal history. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 90 days of incarceration in this matter.

### B.  The History and Characteristics of Kovacik

As set forth in the PSR, Kovacik's criminal history is extensive, spanning from 1995 to the present, consisting largely of misdemeanor arrests, convictions, and numerous traffic infractions. ECF 28 ¶¶ 21-84. The PSR lists 24 criminal convictions. Twelve of those were for driving on a suspended or revoked license. Kovacik also has criminal convictions for resisting an officer (1995); interference with official acts or obstructing an officer (1996, 2018); disorderly conduct (1997); bail jumping (2005, 2008, 2009); shoplifting (2013); and criminal trespass (2018). He has two felony convictions for fleeing/eluding a police officer (2005) and bail jumping (2005). Kovacik also appears to have multiple active warrants in Utah, Illinois, Michigan, and Kansas. ECF 28 ¶¶ 41, 49-53.

In one incident that occurred in October 2004 in Ozaukee, Wisconsin, Kovacik was observed operating a motor vehicle over the posted speed limit. When the officer attempted to initiate a traffic stop, Kovacik fled at a high rate of speed, eventually bailing from the vehicle, and attempting to flee on foot. When the officer caught up to him, Kovacik actively resisted, refusing to produce his hands as the officer attempted to place him handcuffs.   In another particularly

offensive incident in September 2013, Kovacik was denied a request to use a bathroom at a bank in Salt Lake County, Utah. A teller directed him to a nearby restaurant that turned out to be closed. Kovacik later returned to the bank, approached the teller, and placed his feces wrapped in napkins on the counter, telling her "Here you go." ECF 28 ¶ 49.

Kovacik's extensive criminal history is concerning; though largely non-violent, it reveals a total lack of respect for the rule of law. Indeed, his all-embracing criminal history is a major driving factor for incarceration in this case. His behavior over the last several decades – along with the consequences he faced – did absolutely nothing to deter him from future criminal conduct, let alone conduct on January 6, 2021, at the U.S. Capitol.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

12

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Here, the Court should consider Kovacik's extensive criminal history and the likelihood of recidivism. As described above, Kovacik has 24 criminal convictions, 13 of these for the offense

of driving with a suspended license. Kovacik has previously served only short periods of incarceration, and which have been ineffective in getting Kovacik to abide by the laws that govern all citizens. He is not easily deterred, and thus, incarceration is the only meaningful way to ensure such deterrence and compliance.

On the other hand, Kovacik promptly accepted responsibility for his actions by assisting the investigation and providing FBI with links to the YouTube videos he made during the January 6 riot.[3] However, it is also notable that Kovacik's videos have been reposted and remain available under his YouTube account "Huey Long Admirer." Some of the titles of these videos, such as "U.S. Capitol Police- Nothing to see here" and "Treason against the United States is about to be committed" (Exhibit C) compel the government to question the extent and scope of his acceptance and remorse.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Kovacik based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] At least one of Kovacik's videos was relied on by prosecutors at trial. *United States v. Alexander Sheppard*, 21-CR-203 (JDB).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For

16

that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Robert Packer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  Packer's and Kovacik's conduct on January 6 were similar. Both observed violence and vandalism up close, and were present near highly sensitive areas, including the area close to the Speaker's Lobby, where Ms. Babbitt was shot. Both Packer and Kovacik posted content about January 6 onto social

media. Packer had 21 prior criminal convictions for offenses that included forgery, drug possession, and driving offenses. Packer was sentenced to 75 days of incarceration. 21-cr-103 (CJN). Kovacik's criminal history, including his 24 convictions and outstanding warrants in multiple jurisdictions, is more extensive than Packer's and thus merits a longer sentence. Packer also pled guilty and was sentenced early, in September 2022.

Matthew Webler also pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) and received a 45-day sentence of incarceration. 21-cr-741 (DNF). Similar to Kovacik, Webler traveled extensively through the U.S. Capitol, and posted extensively on social media after January 6. Both Webler and Kovacik have extensive criminal histories. Webler was convicted of two aggravated assaults when he was younger and was actually on supervision when he participated in the January 6 riot. During the sentencing hearing, the court noted that Webler's criminal history made him different from other January 6 defendants who also did not directly engage in violence. Kovacik's even more extensive criminal history and the likelihood of his reengagement in criminal behavior should also drive a higher sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In this case, the government submits that a sentence of 90 days incarceration, would not create an "unwarranted disparity" with the sentences imposed in those cases because of the similar factors in this case.

## V.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA)

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Kovacik to pay $500 in restitution for his convictions on Count 4. This amount fairly reflects Kovacik's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Kovacik to 90 days incarceration. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ Douglas Meisel
DOUGLAS MEISEL
NY Bar No. 4581393
Trial Attorney (Detailee)
U.S. Attorney's Office
601 D. Street, N.W.
Washington, D.C.  20530
douglas.meisel@usdoj.gov
(202) 923-7821

<u>**CERTIFICATE OF SERVICE**</u>

On this 8th day of June, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/ *Douglas Meisel*</u>
DOUGLAS MEISEL
Trial Attorney (Detailee)
U.S. Attorney's Office
601 D. Street, N.W.
Washington, D.C.  20530